**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TRUDY TAYLOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 7874** |
| | ) | |
| **BOARD OF EDUCATION OF THE CITY OF** | ) | |
| **CHICAGO and KAREN SAFFOLD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Trudy Taylor was removed from positions as a school principal at two public schools in Chicago. In connection with her removal from those positions, she has sued the Board of Education of the City of Chicago and Karen Saffold, an administrator for the Board, asserting claims under federal and Illinois law. The defendants have moved for summary judgment.

**Background**

The following facts are undisputed unless otherwise noted. Taylor is an African American female. In June 2012, she entered into a contract with the Board and the local school council of Jesse Owens Elementary Community Academy (Owens Academy) to serve as Owens Academy's principal for a four-year term ending on June 30, 2016. Under the contract, Taylor's position as principal could be terminated before that date for specified reasons, including the "closure" of the school, the "permanent merger" of the school "into another attendance center," and Taylor's resignation. Defs.'

L.R. 56.1 Stmt. ¶ 6.

In the spring of 2013, the Board considered whether to close dozens of schools in the district. Taylor contends that Owens Academy was not on the initial list of schools that the Board planned to close but later was added to the list of schools proposed for closure. It is undisputed that, in April 2013, the Board held two community meetings at which members of the public could share their views on the closure of Owens Academy and a public hearing at which the Board presented to a hearing officer evidence concerning the closure.

Taylor did not speak at the public hearing. The parties dispute whether she spoke at the community meetings. The Board has submitted certified reporters' transcripts from those meetings, which do not reflect that Taylor made any comments on the record. Taylor, however, states in an affidavit that she attended at both community meetings and "spoke out publicly against the proposed closure of Owens," Pl.'s Ex. 2 ¶ 5, and she testified during her deposition that she spoke at the community meetings as well.[1]

Taylor's affidavit reflects that she distributed brochures opposing the closing of Owens Academy to parents and community members. It is undisputed that she also prepared a presentation regarding the closure of Owens Academy. Other employees of Owens Academy presented it at the community meetings and the public hearing.

The schools in the district are divided into networks. At the time, Saffold was the

---

[1] The defendants object to a number of statements in Taylor's affidavit, as well as to other evidence on which she relies. To the extent the Court has considered the challenged statements or evidence, it addresses the objections in the discussion section of this opinion.

chief of a different network from the one to which Owens Academy was assigned. The defendants contend that Saffold was not involved in the conversations about closing Owens Academy at all. Taylor's affidavit reflects that Saffold attended a telephone conference with network chiefs and school principals at which "principals were warned not to publicly speak out against the proposed school closings if they did not want to lose their jobs." Pl.'s Ex. 2 ¶ 5.

The defendants assert that the Board closed Owens Academy on June 30, 2013 and reassigned students returning to Owens Academy to a nearby school, Samuel Gompers Fine Arts Options Elementary School (Gompers School). Taylor disputes this. In her affidavit, she states that the Board "never really" closed Owens Academy but kept the building open to students in the grades Owens Academy had served and "just renamed the school to Gompers South." Pl.'s Ex. 2 ¶ 8. During her deposition, Taylor testified that Owens Academy and Gompers School merged and "became one" school. Pl.'s Ex. 1 at 66:12–17. When defense counsel asked Taylor whether Owens Academy was "permanently merged" with Gompers, Taylor responded, "Yes." Pl.'s Ex. 1 at 70:13–15. At some point, Gompers School (the merged school that also consisted of the Owens Academy's former building) was renamed to Jesse Owens Elementary Community Academy (the name of the school at which Taylor had served as principal).

On June 30, 2013, the day the Board contends it closed Owens Academy, the Board removed Taylor from her position as the principal of that school. The parties dispute the nature of Taylor's removal. The defendants have submitted an e-mail indicating that the Board offered Taylor "continued employment in [her] current job title at [her] current rate of pay through October 31, 2013" and that, after that date, she

would need to find "a new opportunity" or she would "be laid-off [sic]." Defs.' Ex. 7 at BOE 003749. By contrast, Taylor's affidavit reflects that she "accepted" the Board's "offer for [her] to become a Citywide principal in order to mitigate [her] damages" and that she "did not have any assigned duties" in that role. Pl.'s Ex. 2 ¶ 10.

Taylor did not find a new position by October 31, 2013. The defendants present a resignation form, purporting to bear Taylor's signature, indicating that she resigned from her position on or soon after that date and that the resignation became effective on November 8, 2013. Taylor contends that she never resigned from her position and did not fill out, complete, or sign that form.

The Board also has submitted documentation indicating that, among other things, Taylor received a payout for the value of her unused vacation days. Taylor, however, states in her affidavit that the Board did not pay her salary and benefits "for the entire term of the agreement" between her, the Board, and Owens Academy's local school council. Pl.'s Ex. 2 ¶ 3.

Taylor went on to work for the Board in other positions. Between December 2013 and July 2015, she served as a principal at three different schools in the district.[2] Starting in July 2015, Taylor became a principal at another school, George Washington Carver School.

The Board contends that at Taylor was an interim principal—an at-will employee who has not entered into a contract with the board and may be dismissed at any time— in each of the principalship roles she held after December 2013, including the position

---

[2] Taylor disputes this fact, but she has not cited to any evidence that contradicts it and has not explained the basis for her dispute.

at Carver School.[3]  Taylor contends that she had implied contracts with the Board during this time.  Her affidavit also reflects that her supervisor from July 2015 until August 2015, Krish Mohip, "promised" her that she "should expect" to work at Carver School at least one year.  Pl.'s Ex. 2 ¶ 12.

Soon after Taylor became the principal at Carver School, Carver became part of the network for which Saffold was the chief of schools.[4]  In this role, Saffold directly supervised principals at about thirty schools, including Taylor.  Among other things, Saffold reviewed and monitored the principals' performance.

The defendants contend that Taylor's job performance at Carver was not satisfactory.  For example, Saffold testified that, among other things, Taylor did not create a system to collect and monitor teachers' lesson plans, she did not have a system by which she would timely observe lessons and give feedback to teachers, and the school was chaotic.  By contrast, Taylor contends that her performance was satisfactory and that Saffold harbored personal animosity toward her and set out to negatively influence her career.

In November 2015, Saffold sent Taylor a memorandum of understanding that identified "[i]nstructional concerns" with Taylor's leadership and listed "[e]xpectations moving forward."  Defs.' Ex. 19 at BOE 000382.  The parties dispute whether Taylor met the expectations set out in the memorandum after that point.

---

[3] Taylor disputes that this is a proper description of an interim principal's role, but she has not cited to any evidence that contradicts it and has not explained the basis for her dispute.

[4] Taylor also disputes this fact, but again she has not cited to any evidence that contradicts it and has not explained the basis for her dispute.

Meanwhile, Taylor applied to Carver's local school council for a contract principal position at Carver. If awarded the position, she would have been awarded a four-year contract that, similar to her contract with Owens Academy, the Board could have terminated early only for specified reasons. In December 2015, the school council voted on two candidates for that position: Taylor and Michael Onofrio, a white male. Neither Taylor nor Onofrio received the necessary number of votes from the council to become a contract principal, so the council asked the school district's chief executive officer Janice Jackson to interview them and select the new principal or designate someone to do so.

In January 2016, Jackson and Elizabeth Kirby, the chief of school strategy and planning, interviewed Taylor. Taylor contends that, at the interview, Jackson and Kirby did not discuss her professional background or her interest in the position. Taylor's affidavit reflects her belief that Saffold had "convinced" them not to hire her and "that they only arranged for the meeting because they were required by law to interview [her], not because they were open to considering [her] for the Carver principalship position." Pl.'s Ex. 2 ¶ 17. For her part, Kirby testified that she found Taylor to be "unprepared" for the interview and "unable to articulate" how she would "improve the school." Defs.' L.R. 56.1 Stmt. ¶ 63.

Jackson and Kirby also interviewed Onofrio. After conducting the interviews, Jackson and Kirby determined that neither Taylor nor Onofrio were qualified for the principal position. They recommended that the school counsel search for a different candidate. Taylor contends that she was qualified for the position and that Saffold had negatively influenced their assessment of her.

On January 20, 2016, Taylor was terminated from her position as the principal of Carver School. The parties dispute how, why, and by whom Taylor was terminated. The defendants contend that Taylor was terminated due at least in part to her performance, Kirby made the final recommendation to terminate her, and Jackson approved of that recommendation. Taylor contends that Saffold made the decision to terminate her, and this was based on, among other things, personal animus against Taylor and/or discrimination against women and African Americans.

On or around January 27, 2016, Saffold learned from a staff member about some discrepancies involving certain expenditures that had been made at Carver School between July 2015 and December 2015. That same day, Saffold shared information about these discrepancies with the Board. The discrepancies appear to have involved, at least in part, allegedly improper overtime payments to staff members at Carver. Taylor's affidavit reflects that she "did not engage in any financial malfeasance." Pl.'s Ex. 2 ¶ 32. The affidavit also reflects that Kirby told Taylor in February 2016, at a meeting Taylor requested with Kirby to discuss her termination, that Taylor was terminated from her position at Carver because of that the alleged financial discrepancies—specifically, because Taylor's "clerk made too much money in the summer of 2015 and during the Christmas holiday season for services that the clerk actually performed." *Id.* ¶ 20. The defendants dispute that this was why Taylor was terminated; as indicated, they contend she was terminated due to concerns about her performance.

Taylor subsequently accepted a position as a teacher in another school district. In September 2019, she retired from that school district. She contends that her

retirement benefits are lower than they would have been if she had served as Carver School's principal for four years, and her affidavit reflects her belief that the Board terminated her employment in order to interfere with those benefits.

In September 2016, another former Chicago Public Schools principal, Saheena Khan, filed a lawsuit on behalf of herself and a minor child against the Board and Saffold. In December 2016, Khan filed a third amended complaint, adding other defendants and Taylor as a plaintiff. That case was assigned to Judge Manish Shah, who granted various defendants' motions to dismiss the fourth amended complaint, *see Khan v. Bd. of Educ. of City of Chicago*, No. 16 C 8668, 2018 WL 1156202, at *1 (N.D. Ill. Mar. 5, 2018); *Khan v. Bd. of Educ. of the City of Chicago*, No. 16 C 8668, 2018 WL 1277458, at *1 (N.D. Ill. Mar. 12, 2018). The plaintiffs filed a fifth amended complaint, and then Judge Shah granted in part and denied in part a motion filed by the Board to dismiss it. *See Khan v. Bd. of Educ. of City of Chicago*, No. 16 CV 8668, 2018 WL 6192186, at *9 (N.D. Ill. Nov. 28, 2018).

The Board subsequently moved to sever the claims asserted by Khan from those asserted by Taylor. Judge Shah granted that motion. Taylor's claims were severed, assigned a new case number, and reassigned to the undersigned judge.

Taylor filed her sixth amended complaint, which is the operative complaint, in January 2019. She asserts against the Board claims for breach of contract (count 1), retaliatory discharge (count 2), a violation of section 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140 (count 3), and a violation of the Illinois Wage Payment and Collection Act (count 4). Against Saffold, Taylor asserts claims for tortious interference with contract (count 5) and for violation of 42 U.S.C. §

8

1981 (count 8). She also asserts, under 42 U.S.C. § 1983, claims against both the Board and Saffold for violations of the Fourteenth Amendment's Equal Protection Clause (count 6) and the First Amendment (count 7).[5]

As indicated, the defendants have moved for summary judgment. After briefing was completed, Taylor sought leave to submit an amended response brief, an amended response to the defendant's Local Rule 56.1(a)(3) statements of fact, and a statement of additional facts under Local Rule 56.1(b)(3)(C) to correct perceived deficiencies identified by the defendants. The Court denied leave because Taylor had "more than enough time"—nearly four months—to file her summary judgment submission and she "must live with what she filed." Dkt. no. 243.

## Discussion

A party is entitled to summary judgment only if it demonstrates that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the Court construes all facts and draws all reasonable inferences "in favor of the party against whom the motion under consideration was filed." *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019).[6]

---

[5] Taylor asserts the section 1983 claims against the Board based on the theory of municipal liability announced in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978).

[6] The defendants ask the Court to strike many of Taylor's responses to the defendants' Local Rule 56.1(a)(3) statements of fact on the ground that Taylor did not explain why she disputed those facts or how her citations to the record demonstrate a dispute. In

## A.    Breach of contract (count 1)[7]

Taylor asserts that she had a written contract with the Board to serve as principal of Owens Academy and an implied contract with the Board to serve as principal of Carver School.  She contends that the Board breached both contracts.  Under Illinois law, a plaintiff alleging a breach of contract claim must prove:  "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages."  *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (internal quotation marks omitted).  The Court discusses each alleged contract in turn.

### 1.    Owens Academy contract

Taylor alleges the Board breached the contract concerning her appointment as principal of Owens Academy by terminating the contract prior to the end of the agreed-upon four-year term.  The Board asserts that it terminated her because the school closed, it permanently merged into another school, and/or Taylor resigned—all reasons that, under the contract, could serve as the basis for terminating Taylor prior to the end

---

addition, the defendants ask the Court to disregard any additional facts to which Taylor has cited because she has not submitted a statement under Local Rule 56.1(b)(3)(C) concerning those facts.  Parties filing opposing motions under Local Rule 56.1 must file a response to each numbered paragraph in the moving party's statement, including specific references to any materials supporting any dispute, and a statement of any additional facts that require the denial of summary judgment.  *See* N.D. Ill. L.R. 56.1(b)(3)(B&C); see also *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).  The Court denies the defendants' requests but has not considered any assertions or denials in Taylor's response that are unsupported by record citations.

[7] Because the contract-related claims involve threshold questions that affect some of the other claims, the Court addresses those claims first and thus addresses the claims in a sequence different from how they are addressed in the complaint and in the parties' briefs.

of the contract's term.

Taylor responds that none of these events occurred and thus none of them could be the basis for her termination. That is not what she said at her deposition, however. When defense counsel asked Taylor whether Owens Academy was "permanently merged" with Gompers, Taylor responded, "Yes." Pl.'s Ex. 1 at 13–15. In short, she admitted that Owens Academy permanently merged with another school, and thus she admitted that one of the specific events that could trigger early termination of the contract had occurred.

In her response brief, Taylor contends that Owens Academy merged with Gompers only temporarily. She bases this contention on the undisputed fact that the combined schools were first called Samuel Gompers Fine Arts Options Elementary School and then, a few months later, renamed to Jesse Owens Elementary Community Academy (the name of the school at which she formerly had been principal). She also bases this contention on the undisputed fact that the school in the building that had housed the former Owens Academy continued to serve students in the same grades as the school she had led. Given the just-quoted admission from Taylor's deposition, however, a reasonable jury would be required to conclude that the schools permanently merged. Indeed, Taylor went on to testify that the merged schools are now called Owens. *Id.* at 71:13–19. The only reasonable inference a jury could draw from the evidence is that the schools still are merged, albeit under the name of the school at which Taylor was principal, and thus the merger was not temporary.

For these reasons, a reasonable jury would be required to find that the schools permanently merged and thus that the Board terminated Taylor for a reason permitted

by the contract. Therefore, no reasonable jury could find that the Board breached the contract concerning Taylor's position as principal at Owens Academy. *See, e.g.*, *Sevugan*, 931 F.3d at 614 ("A breach of contract claim requires an identifiable breach of a contract term."). Accordingly, the Court need not address the parties' arguments concerning whether the Board closed Owens Academy or whether Taylor resigned.

### 2. Carver School

Taylor next contends that she had an implied contract with the Board to serve as the principal of Carver School for one year and that the Board breached that contract by terminating her before the completion of that year. The Board contends there was no implied contract.

Taylor asserts that such a contract was established in one of two ways. First, she contends that an implied contract arose under an Illinois statute concerning the "[r]emediation and probation of attendance centers" in cities of over 500,000 inhabitants (i.e., in Chicago). *See* 105 Ill. Comp. Stat. Ann. 5/34-8.3. That statute provides that the general superintendent of schools must identify schools that fail to meet certain performance standards and place those schools on either remediation or probation. *Id.* 5/34-8.3(a)-(b). Schools that have been placed on probation and "that, after a maximum of one year, fail to make adequate progress in correcting deficiencies are subject to" certain actions, including the removal and replacement of the principal, "by the general superintendent with the approval of the board, after opportunity for a hearing." *Id.* 5/34-8.3(d).

Even if Carver School was on probation (an issue the Court need not decide), no reasonable jury could conclude that this statute supports a finding that Taylor and the

12

Board entered into an implied contract for her to be principal of Carver. This is because, as the just-quoted language shows, the statute has nothing to do with the terms of employment for school principals. It does not state, let alone suggest, that principals of schools on probation may not be terminated until they have served as principal for at least a year. Rather, it merely says that a consequence a school under probation can face if it does not make adequate progress in a year is the removal of its principal. *See id.*

Alternatively, Taylor contends that a person named Krish Mohip "promised" her that she "should expect" to be Carver School's principal for at least one year. Pl.'s Resp. Mem. at 18; *see also* Pl.'s Ex. 2 ¶ 12. Her affidavit reflects that Mohip was her supervisor from July 2015 until August 2015 and "a Board agent," *id.* ¶¶ 12, 24, and Mohip testified that he was a deputy chief network officer at that time. Even if Mohip made Taylor such a promise, however, no reasonable jury could find that this created an implied contract between Taylor and the Board. Taylor has submitted no evidence from which a reasonable jury could find that Mohip had the authority to bind the Board to an implied employment contract. *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 732 (7th Cir. 2014) (applying Illinois law and affirming district court's entry of summary judgment in favor of defendants on breach of contract claim where there was no evidence that an individual who allegedly entered into a contract on behalf of the defendants had actual or apparent authority to do so). Without such evidence, no reasonable jury could find that Mohip's promise created a contract between Taylor and the Board. Accordingly, no reasonable jury could find that the Board breached any implied contract with Taylor.

13

For these reasons, the defendants are entitled to summary judgment on Taylor's breach of contract claim.

## B.    Retaliatory discharge (count 2)

Next, Taylor alleges that the Board terminated her from Carver School in retaliation for discrepancies in expenditures at the school.  Taylor alleges this was unlawful because, she contends, there were no such discrepancies.  To prevail on this claim, Taylor must prove that (1) the Board discharged her, (2) in retaliation for her activities, and (3) "the discharge violates a clear mandate of public policy."  *Walker v. Ingersoll Cutting Tool Co.*, 915 F.3d 1154, 1157 (7th Cir. 2019) (quoting *Turner v. Mem'l Med. Ctr.*, 233 Ill. 2d 494, 911 N.E.2d 369, 374 (2009)).

The defendants contend that Taylor's retaliatory discharge claim is barred by Section 2-201 of the Illinois Tort Immunity Act (TIA).  *See* 745 Ill. Comp. Stat. Ann. 10/2-201.  The Court looks to state immunity rules to determine whether a defendant is immune from liability under state law.  *See Fields v. Wharrie*, 740 F.3d 1107, 1115 (7th Cir. 2014); *Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 777 (7th Cir. 1991).  Because immunity is an affirmative defense, the burden is on the defendants to establish that the TIA bars liability, and the TIA is "strictly construed against" them.  *Van Meter v. Darien Park Dist.*, 207 Ill. 2d 359, 370, 799 N.E.2d 273, 280 (2003).

Section 2-201 of the TIA provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."  745 Ill. Comp. Stat. Ann. 10/2-201.  It immunizes defendants only to the extent that the retaliatory action for which they are

14

being sued "involves both the making of a policy choice and the exercise of discretion."

*See Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 679 (7th Cir. 2009).   The

Illinois Supreme Court has stated that "policy decisions" within the meaning of Section

2-201 are "decisions requiring a governmental entity to balance competing interests and

to make a judgment call as to what solution will best serve those interests."  *Van Meter*,

207 Ill. 2d at 379, 799 N.E.2d at 285.  It has defined "discretionary actions" as actions

that are "unique to a particular public office."  *Id*; *see also Valentino*, 575 F.3d at 679

(municipality not entitled to immunity under section 2-201 where it offered no evidence

that the allegedly retaliatory act was made pursuant to a policy); *Bello v. Village of

Skokie*, 151 F. Supp. 3d 849, 866 (N.D. Ill. 2015) (Kennelly, J.) (municipality not entitled

to immunity under section 2-201 where its employees were not balancing competing

interests in making allegedly retaliatory decision).

The defendants have not met their burden of establishing that they are immune

under Section 2-201.  They do not even attempt to assert that the decision to terminate

Taylor involved a policy decision.  They merely assert that it was a discretionary act.

Because, as indicated, the defendants must establish that the action they took involved

*both* a policy choice and the exercise of discretion, the defendants are not entitled to

immunity under Section 2-201.

The defendants also contend that Taylor cannot show that the Board discharged

her in retaliation for the alleged discrepancies in the school's finances.  "The

requirement that the discharge be in retaliation for plaintiff's activities requires that a

plaintiff establish a causal relationship between the employee's activities and the

discharge."  *Walker*, 915 F.3d at 1157 (quoting *Michael v. Precision All. Grp., LLC*, 2014

IL 117376, ¶ 31, 21 N.E.3d 1183).  The defendants contend that it is undisputed that the Saffold did not discover the allegedly questionable expenditures until January 27, 2016—approximately one week after Taylor was terminated—when a staff member reported the discrepancies to Saffold and she reported them to the Board.  In her response to the defendants' statements of fact under Local Rule 56.1, Taylor disputed the fact that the alleged discrepancies were discovered on that date to the extent that they were "ascribed to Taylor."  Pl.'s Resp. to Defs.' L.R. 56.1 Stmt. ¶ 74.  But Taylor's affidavit reflects that, at a meeting she requested with Kirby in February 2016 to discuss why she had been terminated, Kirby told her that she had been removed from Carver School due to these financial discrepancies.  And a jury reasonably could infer that Kirby knew why Taylor was terminated; Kirby testified that she recommended Taylor's termination to the school district's chief executive officer.  From this evidence, a reasonable jury could infer that Kirby knew about the alleged discrepancies before Taylor was terminated—even if Saffold did not learn about them or report them to the Board until later—and that Taylor was terminated at least in part because of these discrepancies.

In their reply brief, the defendants contend that Taylor cannot prove the third element of a retaliatory discharge claim—that the discharge violated a clear mandate of public policy—because, they contend, "the fact remains that [Taylor] was not terminated in retaliation to the financial malfeasance."  Defs.' Reply Mem. at 15.  The defendants did not assert this argument in their opening brief, so they have forfeited it for purposes of summary judgment.  See *Campos v. Cook County*, 932 F.3d 972, 976 (7th Cir. 2019) ("Parties waive arguments which they develop for the first time in a reply brief.").

Regardless, as just discussed, there is a genuine factual dispute regarding whether Taylor was terminated for the financial discrepancies. Further, to the extent the defendants are contending that terminating Taylor for those discrepancies did not violate a clear mandate of public policy, they have not attempted to explain that contention.

For these reasons, the defendants are not entitled to summary judgment on Taylor's retaliatory discharge claim against the Board. That claim remains for trial.

## C.   ERISA (count 3)

Taylor alleges that the Board violated section 510 of ERISA, 29 U.S.C. § 1140, by unlawfully terminating her before her retirement benefits had fully vested. Section 510 makes it unlawful for "any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant" in an employee benefits plan for the purpose of interfering with his attainment of benefits under the plan. 29 U.S.C. § 1140.

The parties dispute whether the Board's retirement benefits plan qualifies as a governmental plan and thus is not subject to ERISA. See 29 U.S.C.A. § 1003(b)(1) (ERISA's provisions do not apply to an employee benefit plan that is a governmental plan). The Court need not resolve that dispute, however, because even if the plan is subject to ERISA, no reasonable factfinder could find that the Board's termination of Taylor violated section 510 of ERISA.

To prove a violation of section 510, Taylor must show that, by terminating her, the Board specifically intended to interfere with her attainment of benefits. *See Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 826 (7th Cir. 2014). It is not enough for Taylor to prove that the Board's termination of her

17

"incidentally affect[ed]" her benefits under the plan. *See id.* Rather, she must prove that "[t]he intent to frustrate the attainment of benefits" was "at least a motivating factor" behind her termination and/or the interference of her benefits. *See id.*

The only evidence to which Taylor points in support of her contention that the Board violated section 510 is her affidavit. It states, "I believe that the Board terminated my employment in order to interfere with my retirement benefits which would have been substantially greater had I retired after accumulating 35 years of service." Pl.'s Ex. 2 ¶ 33. The Board objects to the admissibility of Taylor's belief because it is not based on her personal knowledge. The Court agrees. *See* Fed. R. Evid. 602, 701(a).

Regardless, even if Taylor's testimony on this point were admissible, it would not create a genuine factual dispute requiring a trial. This is because Taylor has "provide[d] no factual basis for" her opinion and thus has provided no basis on which a reasonable jury could find that her affidavit establishes that the Board violated section 510. *See, e.g.*, *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) (to raise a triable issue of fact, lay opinion testimony must provide a sufficient basis for a reasonable factfinder to make a finding about the allegedly disputed fact).

Taylor also contends that the Board violated ERISA because her termination "all but assured that Taylor's retirement benefits would be reduced." Pl.'s Resp. Mem. at 15. But, as indicated, the reduction of her benefits' value is not in itself enough to prove a violation of section 510. *See Teamsters Local Union No. 705*, 741 F.3d at 826. Instead, she must show the Board terminated her in order to, at least in part, "frustrate the attainment" of her benefits. *See id.* Because Taylor has not offered evidence from which a reasonable factfinder could make such a finding, the defendants are entitled to

summary judgment on Taylor's ERISA claim.

**D.      Illinois Wage Payment and Collection Act (count 4)**

Taylor next alleges that the Board breached the Illinois Wage Payment and Collection Act (IWPCA) by failing to pay her wages and benefits after it terminated her from the principal positions at Owens Academy and Carver School.  The IWPCA requires every employer, "at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period."  820 Ill. Comp. Stat. Ann. 115/3.  It also requires every employer to pay "the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee."  *Id.* at 115/5.

The Court starts by considering Taylor's allegedly unpaid wages and benefits from her position as Owens Academy's principal.  The defendants contend that the Board paid her "all of her unused benefit time" from that position when terminated her from it in, at the latest, November 2013.  Defs.' Mem. at 18.  After that, the defendants contend, the Board did not owe Taylor additional wages and benefits.  Taylor responds that her contract remained in effect until June 2016, and that the Board failed to pay all of her wages through that date.

As the Court explained earlier in this opinion, a reasonable jury would be required to find that the Board appropriately terminated Taylor in 2013 from the principal position under the terms of the contract.  Accordingly, no reasonable jury could find that Taylor's contract remained in effect until June 2016 or that the Board owed her wages

after it terminated her from Owens Academy.[8]  Thus the Board is entitled to summary judgment on Taylor's claim that it breached the IWPCA by not paying wages to Taylor after the termination.

Taylor also contends that she agreed to work at Carver School from July 2015 through June 2016, the Board breached that agreement, and the Board failed to pay her wages under that contract for its full term.  Although Taylor does not fully describe this contention or the nature of the wages she contends she was not paid, it appears to be based on her assertion that she had an implied contract to be the principal of Carver School.  As the Court has concluded earlier in this opinion, however, no reasonable jury could find that such an implied contract existed.  Accordingly, no reasonable jury could find that the Board had agreed to pay wages to Taylor under that alleged contract and, in violation of the IWPCA, did not do so.

For these reasons, the defendants are entitled to summary judgment on Taylor's IWPCA claim.

## E.    Tortious interference (count 5)

In her tortious interference claim against Saffold, Taylor alleges that Saffold interfered with Taylor's contracts to be principal of Owens Academy and Carver School, as well as with her expectancy of a prospective contract to be principal at Carver.

Under Illinois law, the elements for claims for tortious interference with contract are different from the elements for claims of intentional interference with prospective economic advantage.  *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir.

---

[8] If Taylor is contending that she was not paid wages or benefits for the period prior to her termination from Owens Academy, the Court disregards that contention because Taylor has not developed arguments or presented facts in support of it.

20

2014). "An action for tortious interference with contract requires the plaintiff to prove that the defendant induced a third party to breach a contract." *Id.* By contrast, for a claim for intentional interference with prospective economic advantage, a plaintiff must prove: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Id.* (quoting *Voyles v. Sandia Mortg. Corp.*, 196 Ill. 2d 288, 751 N.E.2d 1126, 1133–34 (2001)).

The defendants contend that Saffold did not interfere with either of the alleged contracts or with Taylor's alleged expectancy of a prospective contract. In making that contention, the defendants refer only to the requirements for a claim for intentional interference with prospective economic advantage. Taylor appears to do the same. *See* Pl.'s Resp. Mem. at 19 (citing *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 380, 816 N.E.2d 754, 767 (2004) (elements of intentional interference with prospective economic advantage)).

Regardless, if Taylor is alleging Saffold interfered with Taylor's alleged contracts with Owens Academy and Carver School, no reasonable jury could find in Taylor's favor on such claims. Taylor contends that "Saffold interfered with the [Owens Academy] contract by persuading the Board to change the closure eligibility rules so that Owens could be included [on] the list of [schools for closure]." Pl.'s Resp. Mem. at 19. But she has pointed to no admissible evidence from which a reasonable jury could conclude that Saffold induced the Board to close Owens Academy and terminate its contract with

Taylor. And, as discussed earlier in this opinion, Taylor and the Board did not have a contract concerning her position at Carver School, and no reasonable jury could find that Saffold interfered with a contract that did not exist.

To be sure, Taylor's affidavit reflects her belief that Saffold "manipulated" the Board's process in order to close Owens Academy and thereby interfered with Taylor's contract with that school. Pl.'s Ex. 2 ¶ 6. That statement is, however, inadmissible because it is not based on Taylor's personal knowledge. *See* Fed. R. Evid. 602, 701(a). Though Taylor asserts that her statement is based on her "personal observations," *see* Pl.'s Ex. 2 ¶ 6, that holds no water because she does not describe any such observations. Further, even if Taylor's statement were admissible, it would not create a genuine factual dispute because Taylor has "provide[d] no factual basis for" it and thus has provided no basis on which a reasonable jury could find that Saffold manipulated the school closure process or interfered with the Owens Academy contract. *See, e.g.*, *Yancick*, 653 F.3d at 548; *see also Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (nonmoving party cannot withstand summary judgment on the basis of "[i]nferences supported only by speculation or conjecture").

There is, however, a genuine factual dispute regarding whether Saffold interfered with Taylor's expectation of a prospective contract at Carver School. This involves the four-year contract to become principal, for which Taylor interviewed. Taylor contends that she was not awarded the contract because Saffold interfered with the Board's consideration of her candidacy.

The defendants assert that Taylor could not reasonably expect that the Board would enter into a contract for Taylor to be Carver's principal because, they contend, it

is undisputed that Taylor "was not performing well as the interim principal of Carver." Defs.' Mem. at 19. In support of this, the defendants point to, among other things, Saffold's testimony about and her written assessment of Taylor's performance and the memorandum of understanding concerning Taylor's performance. But Taylor has presented evidence from which a reasonable jury could conclude that her performance as interim principal was adequate. This evidence includes a performance evaluation from the previous school year, when Taylor was the principal of a different elementary school, which indicates that she received an overall rating of proficient. *See* Pl.'s Ex. 25 at BOE 000222 (providing for four possible ratings: unsatisfactory, basic, proficient, and distinguished). Taylor also cites testimony by a former supervisor that when Taylor worked as an assistant principal earlier in her career, her performance was "[d]istinguished." Pl.'s Ex. 10 at 30:5–7. She also cites evidence that Saffold harbored animosity toward her, as reflected in Taylor's affidavit and deposition testimony. Viewing this and other evidence in the light most reasonable to Taylor, a jury reasonably could conclude that her job performance was at least proficient, as it had been in the past, and that Saffold's evaluations of Taylor did not accurately describe her performance due to bias or personal animosity.

The defendants also contend that Taylor cannot show that Saffold "had any influence over" the Board's decision not to award the contract to be Carver's principal to Taylor. Defs.' Mem. at 19. But the defendants have not pointed to any evidence suggesting that, in deciding not to award the contract to Taylor, the Board did not consider Saffold's critical evaluations of Taylor's performance or the memorandum of understanding that Saffold issued to Taylor. Without evidence to the contrary, it would

be reasonable for a jury to infer that the Board considered those materials when it considered whether to offer Taylor the contract and that those evaluations influenced how the Board considered her candidacy. Therefore, the defendants failed to show that no reasonable jury could find that Saffold did not induce or cause the Board to decide not to award the contract to Taylor.

For these reasons, the defendants are entitled to summary judgment on Taylor's tortious interference claim except to the extent it involves her contention that Saffold interfered with her expectation of a prospective contract at Carver School. That part of the claim remains for trial.

## F.    Section 1983 claims

Taylor next asserts, under 42 U.S.C. § 1983, claims against the Board and Saffold for violations of the Fourteenth Amendment and the First Amendment. In evaluating a section 1983 claim, the first step for a court is to "identify the specific constitutional right at issue." *Manuel v. City of Joliet*, 137 S. Ct. 911, 920, (2017) (internal quotation marks omitted). "After pinpointing that right, courts [ ] must determine the elements of, and rules associated with, an action seeking damages for its violation." *Id.* In addition, a school board can be liable under section 1983 only when one of its official policies or customs was "the moving force" that caused the constitutional injury. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978). The Court addresses each alleged constitutional violation in turn.

### 1.    Fourteenth Amendment (count 6)

Taylor alleges that Saffold and the Board discriminated against her on the basis of race and gender in violation of the Fourteenth Amendment's Equal Protection Clause.

The Equal Protection Clause "protects individuals against intentional, arbitrary discrimination by government officials." *Lauderdale v. Illinois Dep't of Human Servs.*, 876 F.3d 904, 909–10 (7th Cir. 2017). Taylor can proceed to trial on this claim if evidence would permit a reasonable factfinder to conclude that racial or gender discrimination caused her to be, as she alleges, removed as principal of Owens Academy and Carver School or given poor performance reviews. *See Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020). In making this determination, the Court must consider the relevant evidence as a whole. *Johnson*, 892 F.3d at 894.

The Seventh Circuit previously distinguished between "direct" and "circumstantial" evidence in employment discrimination cases, but it has done away with those distinctions. *Id.* (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016)). In clarifying that there is a "singular" standard for employment discrimination cases, however, the Seventh Circuit did not disturb the Supreme Court's ruling in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which provides a multi-step burden-shifting framework for deciding such cases. *Id.* This framework is "merely one way of culling the relevant evidence" in an employment discrimination case; it is not the only way to do so. *Id.*

Under the *McDonnell* framework, a plaintiff holds the initial burden to establish a *prima facie* case of discrimination. *See e.g.*, *Barnes*, 946 F.3d at 389. This requires the plaintiff can show that: "(1) she is a member of a protected class, (2) her job performance met the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *McKinney v. Office of*

25

*Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (alteration omitted). If the plaintiff establishes this *prima facie* case, the defendants must rebut the presumption of discrimination by articulating a "legitimate, nondiscriminatory reason" for the employment decision. *Id.* (quoting *McDonnell*, 411 U.S. at 802). The burden then shifts back to the plaintiff to show that the defendant's stated reason is pretextual, which "permits an inference of unlawful discrimination." *Id.*

The defendants rely on the *McDonnell* framework in their briefs. Taylor asserts that this framework is "outdated." *See* Pl's Resp. Mem. at 5. But in discussing the evidence, Taylor discusses first her job performance and then whether she was treated less favorably than similarly situated employees of a different race or gender—that is, she discusses the first and fourth requirements of the *McDonnell* framework. Because, as just explained, that framework continues to be a helpful way to cull the evidence, the Court uses it to structure the following discussion.

The defendants contend that Taylor has not shown that her job performance met the Board's legitimate expectations. As explained earlier in this opinion, however, there is a genuine factual dispute regarding whether Taylor's performance as the principal of Carver School was satisfactory. Therefore, this is not an appropriate ground for summary judgment in the defendants' favor.

The defendants also contend that Taylor has not shown that any other similarly situated individual who was not African American or a woman was treated more favorably than her. "Similarly situated means directly comparable in all material respects," though "[t]he proposed comparator need not be identical in every conceivable way." *Johnson*, 892 F.3d at 895 (internal quotation marks omitted). In determining

26

whether a similarly situated individual who was not from the protected classes was treated more favorably, a court must conduct a "flexible, common-sense, and factual" inquiry in which "[i]t asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Id.* (internal quotation marks omitted). There is no "magic formula" for this inquiry, but some examples of factors consider include: "whether the employees being compared (1) were supervised by the same person, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (internal quotation marks omitted). "Whether a comparator is similarly situated is typically a question for the fact finder, unless . . . the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Id.* (affirming district court's grant of summary judgment on discrimination claim where plaintiffs did not put forth relevant evidence that similarly situated individuals who were not members of the protected class were treated more favorably than the plaintiffs).

Taylor contends that she has identified six similarly situated individuals who were not African American or female and who were treated more favorably than her. Regarding her removal from the contract principal position at Owens Academy, she contends that three individuals—two white males and one African American male who, like her, at the time each held four-year contract principal positions with the Board— were treated more favorably than she was. But she does not explain *how* these individuals were treated more favorably than she was. *See Johnson*, 892 F.3d at 896 ("[I]t is the [plaintiff's] responsibility to go beyond the pleadings and designate specific

facts showing that there is a genuine issue for trial.").  Taylor has cited to no evidence about these individuals, let alone evidence regarding whether they were supervised by the same person as her, subject to the same standards, engaged in similar conduct in similar circumstances, or were materially similar to her in other ways.  In short, Taylor has not presented evidence from which a reasonable jury could find enough common features between her and the three individuals to meaningfully compare them, so she has not sustained her burden.

With regard to her removal from the principal position at Carver School, Taylor contends that she was treated less favorably than two white females and one African American male.  It is undisputed that one of those individuals—Ruth Martini—had a contract with the Board that controlled when and for what reasons the Board could terminate her.  By contrast, Taylor did not have a written contract with the Board for her position at Carver School and, as the Court discussed earlier in this opinion, no reasonable jury could find that she had an implied contract with the Board for that position.  This is a material difference in the terms of Martini and Taylor's employment such that no reasonable jury could find they were similarly situated.

The other white female—Jessica Biggs—was, like Taylor, an interim principal without a contract.  But Taylor does not explain how she and Biggs were otherwise similarly situated.  The only evidence Taylor cites to show the similarities between them is a judicial order from a case in which Jessica Biggs sued the Board alleging that she was deprived of due process when the Board publicly disclosed that Biggs was terminated for allegedly falsifying attendance records.  *See* Pl.'s Ex. 24 at 1.  If anything, this judicial order suggests that Biggs is not an adequate comparator because, like

Taylor, she was removed from her position as principal and thus was *not* treated more favorably than Taylor.  To the extent Taylor is suggesting that Biggs was treated more favorably than her before Biggs's termination, Taylor has pointed to no evidence to support that contention.  Based on the record before the Court, no reasonable jury could find that Biggs was similarly situated to and treated more favorably than Taylor.

A white male with whom Taylor contends she was similarly situated is Onofrio, the other candidate for the contract principal position at Carver School.  Taylor contends that Onofrio was treated better than her because he was interviewed for the Carver School position.  But Taylor has admitted that she, too, was interviewed for that position.  *E.g.*, Pl.'s Ex. 2 ¶ 16.  If Taylor is contending that Onofrio received a fair interview and she did not, she has submitted no admissible evidence providing a factual basis from which a reasonable jury could infer that this was so.  If anything, the fact that Onofrio did not receive the contract position suggests that he was not treated more favorably than her.  Taylor also contends that Onofrio was not removed from his school and that Saffold did not discourage the Board from hiring him as a contract principal, but she has cited no evidence in support of that contention.  Indeed, defendants have submitted evidence reflecting that Onofrio was an assistant principal who did not have a position at Chicago Public Schools at the relevant time—which indicates that Onofrio was *not* in a similar position as Taylor.

For these reasons, Taylor has not sustained "her burden of putting forth relevant evidence" that other similarly situated individuals who were not of her race or gender were treated more favorably than she was, and the defendants are entitled to summary judgment on her Fourteenth Amendment claim.  *See Johnson*, 892 F.3d at 897.

Taylor asserts—correctly—that the Court must consider the evidence as a whole in deciding her Fourteenth Amendment claim. *Johnson*, 892 F.3d at 894. But if she is contending that other evidence gives rise to a genuine factual dispute concerning her Fourteenth Amendment claim, the Court disagrees. The other evidence to which Taylor cites concerns Saffold's alleged animus toward her, which she contends dates to 2007 and allegedly motivated Saffold to give her poor performance reviews. In particular, Taylor points to statements in her affidavit that Saffold told Taylor's former colleagues "that some black women like [Taylor] are snakes that cannot be trusted." Pl.'s Ex. 2 ¶ 6; *see also id.* ¶ 18. The defendants object to these statements as inadmissible hearsay, and the Court agrees; Taylor is citing out-of-court statements by others to prove the truth of the matters asserted in those statements—i.e., that Saffold was racist. *See* Fed. R. Evid. 801. Regardless, evidence about Saffold's animus toward Taylor or toward people of her race and gender would not suffice to survive summary judgment. This is because Taylor has not presented admissible evidence showing that racial or gender discrimination *caused* her to be removed as principal of Owens Academy and Carver School or to be given poor performance reviews. Her speculation or assumption that discrimination caused her to be removed from those positions or given poor performance reviews is not enough to sustain her burden on summary judgment. *See Johnson*, 892 F.3d at 894.

For these reasons, the defendants are entitled to summary judgment on Taylor's Fourteenth Amendment claim against the Board and Saffold.

### 2. First Amendment (count 7)

Taylor also alleges that the Board and Saffold retaliated against her in violation of

30

the First Amendment. "The First Amendment, incorporated against the states through the Fourteenth Amendment, shields government employees from retaliation for engaging in protected speech." *Diadenko v. Folino*, 741 F.3d 751, 755 (7th Cir. 2013). Taylor alleges that she engaged in protected speech when she participated in a conference call concerning school closings, spoke out against the closings at the community meetings organized by the Board, and created and distributed brochures opposing the closure of Owens Academy to community members. In retaliation for those actions, Taylor alleges, she was removed from her positions as principal of Owens Academy and Carver School.

To survive summary judgment on this claim, Taylor must show that her speech was constitutionally protected and that the defendants' removal of her from the principal positions at Owens Academy and/or Carver School was motivated at least in part by her constitutionally protected speech. *See McGreal v. Village of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017). If Taylor makes this initial showing, the burden shifts to the defendants to show that they would have taken the same action in the absence of Taylor's protected speech. *Id.* at 313. If the defendants carry that burden, the burden shifts back to Taylor to "demonstrate that the [defendants'] proffered reason was pretextual and that the real reason was retaliatory animus." *Id.*

The parties dispute whether Taylor engaged in protected speech. The Court need not address that dispute, however, because even if Taylor's speech was constitutionally protected, she has not provided evidence from which a reasonable jury could find that her speech was a motivating factor for her termination. Taylor contends that Owens Academy "was added to" the proposed list of schools to close "[a]s a result

31

of her speech." Pl.'s Resp. Mem. at 3. But she provides no evidence for that contention beyond her belief, reflected in her affidavit, that Saffold "manipulated the Board's school closure process." Pl.'s Ex. 2 ¶ 9. As the Court explained earlier in this opinion, that statement in her affidavit is inadmissible and, regardless, provides no factual basis on which a reasonable jury could find that Saffold manipulated the school closure process. *See* Fed. R. Evid. 701; *Yancick*, 653 F.3d at 548.

If Taylor is contending that the timing between her allegedly protected speech and her removal from the principal positions supports an inference that the defendants removed her at least in part because of her protected speech, the Court disagrees. Suspicious timing is "rarely [ ] sufficient in and of itself to create a triable issue." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). "[F]or a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that an adverse employment action follows close on the heels of protected expression." *Id.* (internal quotation marks omitted). There is no set interval to establish such causation, but "the closer two events are, the more likely that the first caused the second." *Id.* (alteration omitted).

In *Kidwell*, the Seventh Circuit found that two-month and five-week time periods between allegedly protected speeches and allegedly retaliatory actions were too extended to support an inference of retaliation. *Id.* at 967. The same is true in this case. Taylor made her allegedly protected speech in April 2013.[9] She was removed

---

[9] The community meetings occurred in April 2013. Taylor's affidavit reflects that she distributed brochures "to parents and community members to persuade them to take positions against the proposed closure of Owens," but she has not submitted any evidence indicating when she did so. *See* Pl.'s Ex. 2 ¶ 5. The only reasonable inference a jury could make, however, is that Taylor distributed these brochures during

from her position at Owens Academy in June 2013, and her contract with the Board was terminated as late as November 2013. She was removed from her position at Carver School in January 2016. Even viewing the evidence in the light most favorable to Taylor, these intervals of over two to about five months (depending on whether Taylor is contending that the adverse action was her removal or the termination of her contract, which is not entirely clear) and nearly three years are too long to support a reasonable inference of causation without other supporting evidence. Therefore, the defendants are entitled to summary judgment on Taylor's First Amendment claim. Accordingly, the Court need not address the parties' other arguments regarding that claim.

Because Taylor has not provided evidence from which a reasonable jury could that the defendants violated the Fourteenth or First Amendments, the Court need not address whether the Board can be liable for those alleged violations under the theory articulated in *Monell*, 436 U.S. at 694–95.

## H. 42 U.S.C. § 1981 (count 8)

Finally, Taylor alleges that Saffold violated 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcement of contracts. But Section 1981 does not provide a right of action against state actors, including individual governmental-officer defendants named in their official capacities. *Campbell v. Forest Pres. Dist. of Cook Cty.*, 752 F.3d 665, 671 (7th Cir. 2014); *de Lima Silva v. Wis. Dep't of Corr.*, 917 F.3d 546, 559 n.12 (7th Cir. 2019).

---

or before April 2013. This is because that is when the Board was holding hearings on the closure of Owens Academy; it is when parents' and community members' positions on the matter would have made a difference in the Board's decision on whether or not to the school.

Taylor contends that she brought this claim against Saffold in her individual capacity. Taylor does not explain, however, a basis upon which one would hold Saffold individually liable if no reasonable jury could find that Board engaged in unlawful discrimination or that Saffold did so in her official capacity. *See Lauderdale*, 876 F.3d at 911 (affirming district court's grant of summary judgment on claim alleged against government employees in their individual capacities where the plaintiff "failed to provide sufficient evidence that that would allow a reasonable jury to find that [the employees] personally engaged in unlawful discrimination"). That aside, the same standards governing liability under section 1983 apply to section 1981. *Sommerfield v. Knasiak*, 967 F.3d 617, 622 (7th Cir. 2020). Because, as the Court explained earlier in this opinion, no reasonable jury could find in Taylor's favor on her race discrimination claim under section 1983, no reasonable jury could find in her favor on her race discrimination claim under section 1981 either. Therefore, the Court grants the defendants' motion for summary judgment on Taylor's section 1981 claim.

### Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment [173] in part and denies it in part. Summary judgment is denied with respect to the retaliatory discharge claim in count 2 and the tortious interference claim in count 5 concerning whether defendant Saffold interfered with Taylor's reasonable expectation of a prospective contract at Carver School. The defendants are entitled to summary judgment on the remainder of count 5 and on all of Taylor's other claims. Because the only remaining claims are state-law claims over which the Court would not have original jurisdiction, the parties are directed to show cause in writing by September 4, 2020 why

the Court should not dismiss those claims for lack of supplemental jurisdiction under 28

U.S.C. § 1367(a)(3).  The case is set for a status hearing on September 10, 2020 at

9:20 a.m., using call-in number 888-684-8852, access code 746-1053.  Counsel should

wait for the case to be called before announcing themselves.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 27, 2020